# IN THE COURT OF APPEALS 10/15/96

# OF THE

# STATE OF MISSISSIPPI

## NO. 92-KA-00724 COA


**DENNIS GERALD WILLIS AND WILLIAM ANDREW PITTMAN, JR.**

**APPELLANTS**

**v.**

**STATE OF MISSISSIPPI**

**APPELLEE**

**Consolidated With**

**NO. 94-KA-01019 COA**


**PRINCE CARTER A/K/A PRINCE CHARLES CARTER**

**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**

**APPELLEE**


THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. WILLIAM (BILL) JONES

COURT FROM WHICH APPEALED: CIRCUIT COURT OF JACKSON COUNTY

ATTORNEYS FOR APPELLANTS:

GEORGE S. SHADDOCK (WILLIS)

THOMAS E. ROBERTSON (PITTMAN)

JAMES L. FARRIOR, III (CARTER)

ATTORNEY FOR APPELLEE:

OFFICE OF THE ATTORNEY GENERAL

BY W. GLENN WATTS

DISTRICT ATTORNEY: DALE HARKEY

NATURE OF THE CASE: CRIMINAL - MURDER

TRIAL COURT DISPOSITION: ALL THREE APPELLANTS FOUND GUILTY AND SENTENCED TO LIFE IN PRISON


BEFORE FRAISER, C.J., COLEMAN, AND KING, JJ.

COLEMAN, J., FOR THE COURT:

The Jackson County Grand Jury jointly indicted Dennis Willis, William Pittman, Jr., and Prince Carter for the murder of Marcus Fulton. Pursuant to their joint trial, the jury found all three of them guilty of murder. Willis and Pittman were adults, and Carter was but sixteen years old when the jury convicted him. The trial court sentenced all three of the Appellants to serve a term of life in the custody of the Mississippi Department of Corrections. All three of the Appellants have appealed; but we resolve the issues which each of them has raised adversely to them and affirm the trial court's judgments of their guilt and sentences of life in the custody of the Mississippi Department of Corrections.

## I. FACTS

On the evening of June 13, 1991, a group of young people were "hanging out" in the parking lot of the Carver Village Apartments, a low-income housing project located in Pascagoula. At approximately 10:00 P.M., a late model Chevrolet pick-up driven by twenty-two-year-old Joycelyn Lett made its way into the parking lot. Riding with Lett in the pick-up truck were Lett's five-year-old son, Cassius, Lett's fourteen-year-old step-son, Joseph Long, and Long's fifteen-year-old friend, Marcus Fulton. Lett had pulled into the parking lot in order to visit with her twenty-one-year-old brother, Carlos Knowles, who was among the group of young people socializing in the parking lot. Twenty-year-old William Pittman, twenty-two-year-old Dennis Willis, and fifteen-year-old Prince Carter (referred to collectively as "the Appellants") spotted the pick-up truck as Joycelyn Lett drove it into the Carver Village parking lot.

Prince Carter and Joseph Long possessed a history of mutual animosity and confrontation. Gang sympathies and tensions were also at play, with Long being identified in the minds of the Appellants with a gang known as "the Crips" and the Appellants being sympathetic to a rival gang known as "the Bloods." Carver Village may have been considered to belong in the Bloods' territory. The Appellants began to antagonize the occupants of the pick-up truck, with Willis shining his flashlight in their

direction and saying racial epithets which were normally directed by the Bloods toward members of the Crips. At trial, Joycelyn Lett testified Carter threw a plastic soda bottle and other objects, perhaps bricks, at the truck as she was leaving the parking lot.

In response to Carter's aggression, Joseph Long, who was riding on the passenger's side of the pick-up truck, pulled out a .25 caliber pistol and fired two "warning shots." Whether or not he fired the shots into the air depended on whether the State's or the Appellants' witnesses were testifying. Appellants' witnesses testified that Long fired the pistol into the crowd who were socializing in the parking lot that night. The truck then exited the parking lot, and proceeded onto Highway 90 where it traveled east toward Moss Point.

As Lett drove the pick-up away from the Carver Village parking lot with her son, Marcus Fulton, and Joseph Long as passengers, Pittman, Willis, and Carter got into Pittman's white 1982 Fleetwood Cadillac and took off after the pick-up truck. The Appellants eventually caught up to the pick-up truck, which Lett was driving in the North, or left lane, of the Eastbound lanes. Pittman was driving his Cadillac in the South, or right, lane of the Eastbound lanes of Highway 90. As Pittman approached Lett's pick-up, he flashed his car's headlights to attempt to stop Lett. As the Cadillac on the right drew even with Lett's pick-up on the left, several shots rang out. At least two bullets entered the pick-up. One was found inside the right door, and the other was removed from within Marcus Fulton's skull.

Long testified that when the shooting began, he looked over into Pittman's Cadillac and saw both Carter and Willis riding in the back seat with their pistols pointed at the truck and blazing away. Both Willis and Pittman testified that Willis was riding in the front seat on the passenger's side of the Cadillac. According to Willis and Pittman, only Carter was sitting on the back seat of Pittman's Cadillac. When Lett realized that Marcus Fulton was bleeding profusely because he had been hit by one of the bullets, she immediately crossed over the grass-covered median strip running down the center of Highway 90 and turned the pick-up truck 180 degrees so that she was driving it in a westward direction on Highway 90. She drove Fulton to Singing River Hospital in Pascagoula. Later that night Fulton was flown by helicopter to the South Alabama Hospital in Mobile for surgery. Four days after on June 17, Marcus Fulton died from the bullet which had entered the rear of his skull almost at its center-line and lodged above his left ear inside the skull. Dr. Emily Ward, forensic pathologist whom the Alabama Department of Forensic Sciences employed as a state medical examiner in the Region IV laboratory in Mobile, removed the projectile from within Fulton's skull when she performed an autopsy on Fulton.

As we noted, Pittman, Willis, and Carter were jointly indicted, tried, and convicted of murdering Marcus Fulton. The indictment which the Jackson County Grand Jury returned against them rested on Section 97-3-19 of the Mississippi Code. After the trial court denied the Appellants' post-trial motions, Pittman and Willis filed their appeals together, but Carter filed a separate appeal. By order of the Mississippi Supreme Court, both appeals have been consolidated. We will review such portions of their trial as become relevant to the issues which each of them have raised in their respective appeals.

## II. Issues and the law

In their briefs, both Pittman and Willis present this Court with the following four issues for it to

resolve:

POINT ONE: THE TRIAL COURT ERRED IN THE GRANTING OF JURY INSTRUCTION S-1 . . . OVER OBJECTION.

POINT TWO: THE TRIAL COURT ERRED IN THE GRANTING OF JURY INSTRUCTION S-2 . . . OVER OBJECTION.

POINT THREE: THE TRIAL COURT ERRED IN OBJECTING TO TESTIMONY, BY THE COURT, OF [PITTMAN'S] COUNSEL IN THE PRESENCE OF THE JURY.

POINT [SEVEN]: THE CUMULATION OF ERROR IN THIS CASE DEMANDS REVERSAL.

In his brief, Willis alone poses this issue for us to decide:

POINT FOUR: THE TRIAL COURT ERRED IN FAILING TO SUSTAIN APPELLANT'S MOTION FOR MISTRIAL AFTER THE STATE, IN DIRECT VIOLATION OF AN ORDER IN LIMINE, CROSS-EXAMINED APPELLANT ON HIS HAVING A GUN ON THE NIGHT IN QUESTION.

In his brief, only Pittman raises the following issue for our analysis and determination:

POINT [FIVE]: THE TRIAL COURT ERRED IN NOT SEQUESTERING THE JURY AFTER THE JURY RECEIVED THE CASE.

In his brief, Carter first "joins in and adopts by reference each and every pertinent part of co-appellants', Willis' and Pittman's, briefs pursuant to Mississippi Rule of Appellate Procedure 28(1). Carter's one issue which only he submits reads as follows:

ISSUE II

Whether the trial court erred in failing to consider the alternatives available under Section 43-21-159 of the Mississippi Code of 1972, when sentencing appellant Carter, a sixteen year old at the time of sentencing.

We will review, analyze, and resolve these issues in the order we have listed them except for the fourth issue which Willis and Pittman raise and in which Carter joins. That issue we save for last.

**POINT ONE: THE TRIAL COURT ERRED IN THE GRANTING OF JURY INSTRUCTION S-1 . . . OVER OBJECTION.**

Over the strenuous objection of all three Appellants, the trial court granted Jury Instruction S-1 which the State originally requested. Jury Instruction S-1 as finally amended by the trial court in response to some of the objections which counsel for the various Appellants made read as follows:

**JURY INSTRUCTION -- S-1**

> The Court instructs the Jury that the Defendant, DENNIS GERALD WILLIS, has been charged with the crime of Murder for having caused the death of Marcus J. Fulton, with the deliberate design to kill Marcus J. Fulton.

> If you find from the evidence in this case beyond a reasonable doubt that on or about June 13, 1991, in Jackson County, Mississippi, that:

> 1. the deceased, Marcus J. Fulton, was a living person; and

> 2. The Defendant, DENNIS GERALD WILLIS, did feloniously, wilfully unlawfully with deliberate design while acting alone or encouraging, aiding or assisting in any material manner, others, in the killing of Marcus J. Fulton;

> then you shall find the Appellants, DENNIS GERALD WILLIS, Guilty of Murder.

> If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Appellants, DENNIS GERALD WILLIS, Not Guilty of Murder.

Carter, Pittman, and Willis now assert that the trial court erred when it gave this instruction. In doing so, the Appellants make conclusory allegations that this instruction was "inaccurate and confusing," that it was defective, that it did not require "the Jury to find every element of the offense," and that it skirted the requirements of the statute. The Appellants, however, do not identify the specific defects in the instruction. They only refer to the arguments and objections that counsel for Carter, Pittman, and Willis made to the trial judge during the jury instruction conference.

We have examined the transcript of this conference. The first objection that the attorneys made was that Instruction S-1 failed to include the words "malice aforethought" in its description of the mental state required for the crime of murder. Further, because Instruction S-1 was consistent with the words of Section 97-3-19(1)(a) of the Mississippi Code, -- especially with respect to its use of the term "deliberate design" -- the trial court was correct in overruling this objection. The second objection that defense counsel made was that the instruction as originally drafted did not include the word "unlawfully" in its description of how the killing of Fulton occurred. The record reveals,

however, that the trial court amended all three Instructions S-1 to read "did feloniously, wilfully, *unlawfully* with deliberate design . . . ."

In *Tran v. State*, No. 92-KA-01058-SCT, slip op. at 2 (Miss. Aug. 22, 1996), the Mississippi Supreme Court reviewed and summarized the law on murder instructions in response to Tran's several complaints about jury instructions which he argued were erroneous. Relevant to the three Appellants' objection in the case *sub judice* that the instructions S-1 omitted the term "malice aforethought," the Mississippi Supreme Court noted:

> Tran also argues that the first paragraph of the instruction may be a correct statement of the law as to malice aforethought, but it simply does not do as a definition of the very different element of deliberate design. However, "[i]t has long been the case law of this state that malice aforethought, premeditated design, and deliberate design all mean the same thing." *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992) (quoting *Johnson v. State*, 475 So. 2d 1136, 1139 (Miss. 1985)) (citing *Dye v. State*, 127 Miss. 492, 90 So. 180 (1921); *Hawthorne v. State*, 58 Miss. 778 (1881); *McDaniel v. State*, 16 Miss. (8 S. & M.) 401 (Miss.1847))). "Definitionally, we regard 'malice aforethought' and 'deliberate design' as synonymous." *Blanks v. State*, 542 So. 2d 222, 227 (Miss. 1989) (citing *Fairman v. State*, 513 So. 2d 910, 913 (Miss. 1987); *Johnson v. State*, 475 So. 2d 1136, 1139 (Miss. 1985); *Lancaster v. State*, 472 So. 2d 363, 367 (Miss. 1985)).

*Tran*, slip op. at 2. In the case *sub judice*, all three Jury Instructions S-1 required the jury to find beyond a reasonable doubt that each of the three Appellants 'with deliberate design" either killed or "encourag[ed], aid[ed], or assist[ed] in any material manner, others, in the killing of Marcus J. Fulton." According to *Tran*,"deliberate design" is the same as "malice aforethought." Thus, the trial court did not err when it granted these three Jury Instructions which included the term "deliberate design" but omitted "malice aforethought."

The Mississippi Supreme Court reversed Tran's conviction of murder because the trial court erred when it instructed the jury that "[d]eliberate design may be presumed from the unlawful and deliberate use of a deadly weapon." *Id*. at 2. However, the supreme court discussed the merits of Jury Instruction S-2 "to assist the lower court on remand." *Id*. at 6. Jury Instruction S-2 read as follows:

> If you find from the evidence in this case, beyond a reasonable doubt that on or about June 21, 1990 in the Second Judicial District of Harrison County, Mississippi, that:
>
> A. The deceased, Chi Phuong Ho, was a living person, and
>
> B. The defendant, Phuc Hoang Tran, while acting alone or in concert with another, did willfully and of his deliberate design kill Chi Phuong Ho by shooting him with a shotgun; and
>
> C. That said shooting was not in necessary self-defense, then you shall find the defendant guilty of Murder.
>
> If the State has failed to prove any one or more of these elements beyond a reasonable

doubt, then you shall find the defendant, Phuc Hoang Tran, not guilty of murder.

*Id.* at 6-7. The *Tran* Jury Instruction S-2 is remarkably similar to the three Jury Instructions S-1 in the case *sub judice*. Tran argued that this instruction "peremptorily excluded the jury from the consideration of homicide less than murder" and that it "recite[d] only the self-defense exception and faile[d] to mention all other circumstances under which the jury could have found the homicide to have been justifiable, excusable, or manslaughter." *Id.* at 7. The supreme court found that the instruction was not peremptory because it allowed the jury to consider homicide less than murder. *Id.* It rejected Tran's argument that the instruction was erroneous because it omitted circumstances other than "self-defense" under which the jury could have found the homicide to have been justifiable, excusable, or manslaughter. *Id.* The supreme court rejected Tran's second attack on this instruction because it found that self-defense was Tran's only defense and that other instructions adequately covered self-defense." *Id*.

Finally, counsel for Carter, Pittman, and Willis objected to the use of the phrase "aiding and abetting" in the three Jury Instructions S-1. The similarity between Jury Instruction S-2 in *Tran* and the three Jury Instructions S-1 in the case *sub judice* remains relevant to this particular objection. The *Tran* Instruction S-2 contained similar language, "while acting alone or in concert with another;" yet the supreme court did not criticize its inclusion in *Tran*. Moreover, without objection from counsel for any of the three Appellants, the trial court granted the following instruction which the State requested:

## Jury Instruction S-6

> The Court instructs the Jury that each person present at the time of consenting to, and encouraging, aiding, or assisting in any material manner in the commission of a crime, or knowingly and wilfully doing any act which is an ingredient in the crime, is as much a principal as if he had with his own hands committed the whole offense.

In *White v. State*, 330 So. 2d 877 (Miss. 1976) the Mississippi Supreme Court decided that appellant White's testimony and handwritten statement that he kicked the victim in the leg during an assault by his companion provided the basis for an instruction which charged the jury that each person present, consenting to the commission of an offense, and doing any act which was an ingredient or immediately connected with it, or which lead to its commission, was a principal to the same extent as if he committed the whole crime. *Id*. at 879. The supreme court observed:

> It is sufficient if there were a community of purpose between the accused and the direct actor or person who actually caused the death, at the time the homicide was committed.

*Id.* at 880. This Court concludes that the trial court was correct in overruling the objection to the inclusion of the words "aiding and abetting" in Jury Instructions S-1 because Joseph Long and William Pittman testified that Carter fired a weapon at the pick-up truck while Pittman was driving

the Cadillac. Further, the record contains evidence that Willis encouraged Carter's shooting into the pick-up truck while Pittman drove the Cadillac from which Carter fired the shots. Joseph Long testified that both Willis and Carter were sitting on the backseat of Pittman's Cadillac and that both Carter and Pittman were firing guns into the pick-up truck as Joycelyn Lett drove easterly on Highway 90. The evidence in the record is more than sufficient to establish that both Pittman and Willis aided and abetted Carter when he shot at least twice into the Lett pick-up truck and thus to support the inclusion of the "aiding and abetting" language in Instruction S-1. We accordingly resolve this issue against Carter, Pittman, and Willis and affirm the trial court's giving all three Jury Instructions S-1.

## POINT TWO: THE TRIAL COURT ERRED IN THE GRANTING OF JURY INSTRUCTION S-2 . . . OVER OBJECTION.

Jury Instruction S-2 reads:

## JURY INSTRUCTION -- S-2

> The Court instructs the jury that if the evidence warrants it and you so believe from the evidence in this case beyond a reasonable doubt, then you may find the Defendants Guilty of a lesser crime such as manslaughter. However, notwithstanding this right, it is your duty to accept the law as given to you by the Court, and if the facts and the law warrant a conviction of the crime of Murder, then it is your duty to make such findings uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if evidence fails to prove the original charge but does justify a verdict for the lesser crime.

The Appellants assert that this instruction was flawed because "no elements are given to the Jury of a lesser crime [of manslaughter] so thus the Jury must rely on pure speculation." They further argue that "coupled with the flaws of the Instruction S-1 as argued, the possibility of the jury's running "amuck" . . . is just too great.

Their assertion, however, must fail. The appropriate standard of review for jury instructions requires that we do not review such instructions in isolation; rather, they are to be read as a whole to determine if the jury was properly instructed. The Mississippi Supreme Court explained this concept in *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991) when it wrote the following:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. (citations omitted).

Moreover, "[d]efects in a specific instruction do not require reversal where all instructions taken as a whole fairly -- although not perfectly -- announce the applicable rules of law. *Peoples Bank and Trust Co. v. Cermack*, 658 So. 2d 1352, 1356 (Miss. 1995).

In addition to instruction S-2, the jury was also given instruction S-3, which read:

## JURY INSTRUCTION -- S-3

> The Court instructs the Jury that if the State has failed to prove any one of the essential elements of the crime of Murder, then you must find the Appellants Not Guilty of said offense and you will proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all the elements of the lesser crime of Manslaughter.
>
> If you believe from the evidence in this case beyond a reasonable doubt that in Jackson County, Mississippi, on the time and date charged and testified about:
>
> A. The deceased, Marcus J. Fulton, was a living person; and
>
> B. That Marcus J. Fulton, died as a result of the Defendant, DENNIS GERALD WILLIS, while acting alone or encouraging, aiding, or assisting in any material manner, others, in the shooting of Marcus J. Fulton without malice while in the heat of passion or by the use of a dangerous weapon, without authority of law and not in necessary self-defense; then you shall find the Defendant, DENNIS GERALD WILLIS, Guilty of Manslaughter.
>
> If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant, DENNIS GERALD WILLIS, Not Guilty of Manslaughter.

The Mississippi Supreme Court has opined that "When there is an issue for the jury on the question of murder, the defendant cannot complain of the granting by the court of an instruction on manslaughter." *Crawford v. State*, 515 So. 2d 936, 938 (Miss. 1987) (citations omitted).

We apply the previously stated rules of review to hold that because Jury Instruction S-3 set forth the requisite elements of the crime of manslaughter, the jury was properly instructed on the law, notwithstanding the fact that instruction S-2, which we find to be introductory to Jury Instruction S-3, *standing alone,* would have been inadequate to inform the jury as to the necessary elements of the offense of manslaughter. Therefore, we decide this issue adversely to all three Appellants and affirm the trial court's granting Jury Instruction S-2 to the jury.

## POINT THREE: THE TRIAL COURT ERRED IN OBJECTING TO TESTIMONY, BY THE COURT, OF [PITTMAN'S] COUNSEL IN THE PRESENCE OF THE JURY.

At the very end of the second day of the trial of the case *sub judice*, while Pittman's counsel

questioned Veronica Turnipseed on re-direct examination, the record contains the following examination and the trial court's involvement in that examination of Veronica Turnipseed:

Q. Sergeant Veil has known about you all along, hasn't he?

A. Yes.

Q. And he knew you were out there that night, didn't he?

A. He didn't know that I was out there that night until another case that had came [sic] up. That's when he interviewed me again, when my cousin got murdered last year.

Q. So the police department had known prior to today about you [sic] being out there that night, hadn't they?

BY MR. SAUCIER: We have already made an objection to this line of testimony. It's outside the scope of cross-examination.

BY MR. FARRIOR: Judge, on Cross he asked her why didn't she bring out this story to them before, make this Information known before. And this is re-direct on that cross-examination question.

BY THE COURT: Objection is overruled. Go ahead with whatever you have.

BY MR. ROBERTSON: Tell this jury Sergeant Veil knew about you, didn't he?

A. Yes

Q. In this particular case here?

A. Yes, sir.

BY THE COURT: Please don't lead counselor. It's your witness. You have been leading through all the testimony that she has made.

BY MR. ROBERTSON: I'm sorry, Judge. I have no further questions

BY MR. SHADDOCK: I have no further questions.

BY THE COURT: Any further? You are free to go.


After the trial judge excused Veronica Turnipseed as a witness, he recessed the court until the next morning at nine o'clock.

When the trial court re-convened the next morning at 9:00 A. M., Pittman's counsel told the judge that he though it was "highly improper" for him to have entered an objection to his having asked a leading question of [Veronica Turnipseed] and that it prejudiced Pittman in front of the jury for him to have done so. He then asked the trial judge to instruct the jury "to totally disregard it." Although counsel for Carter and Willis joined in this request, the trial judge declined so to instruct the jury for

the following reason:

> The Court understands the law to be such that not only should it make objections to those kinds of procedural matters, but it has a duty to do so. Therefore, your motion will be overruled.

After the trial judge refused to instruct the jury to disregard his admonition to Pittman's counsel not to lead the witness on re-direct examination. Pittman's counsel then moved for a mistrial on the ground that "[i]t highly inflame[d] the jury." Pittman's counsel reminded the trial judge that the prosecutor had not objected to the question when the trial judge admonished him not to lead the witness as he had been doing "through all the testimony that [the witness] ha[d] made." As before, counsel for Carter and Willis joined in Pittman's motion for a mistrial. The trial judge denied Pittman's motion for mistrial on the same ground that he refused to instruct the jury to disregard his admonition to counsel not to lead the witness.

Carter, Pittman, and Willis argue that the controlling case on this point is *West v. State*, 519 So. 2d 418, 421 (Miss. 1988), in which the Mississippi Supreme Court held that the active involvement and assistance of a trial judge with the prosecution of a defendant is reversible error. In *West*, the supreme court observed:

> We have carefully examined the eight-volume record and find that there are thirty (30) instances where the trial judge improperly, or unnecessarily, interjected himself into the proceedings. Of those thirty instances, twenty are of the type which may be characterized as coaching the district attorney. On nine occasions, the trial judge posed questions to witnesses where the district attorney's questions were ineffective. The questions by the trial judge generally served to strengthen the prosecution's case.

*West*, 519 So. 2d at 421. In the case *sub judice* Appellants complain of only one incident which they claim demonstrates the trial judge's involvement in their prosecution on the side of the State.

Appellants then quote the following sentences from *Thompson v. State*, 468 So.2d 852, 854 (Miss. 1985):

> "It is a matter of common knowledge that jurors . . . are very susceptible to the influence of the judge. [J]urors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict. He cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party. (quoting *Green v. State*, 97 Miss. 834, 53 So. 415 (1910)).

Appellants conclude their argument on this issue by asserting that "In making comments and asking questions that would insinuate the court's ability to control the trial to the benefit of a particular

position, the court then has exceeded its authority." They submit that the trial judge's admonishment to Pittman's counsel not to lead the witness, which he made in the presence of the jury, "created and improper effect on this jury."

Mississippi Rule of Evidence 611 disposes of this issue. In *Shows v. State*, 267 So. 2d 811, 812 (Miss.1972), a case decided before the Mississippi Rules of Evidence became effective January 1, 1986, the Mississippi Supreme Court advised the bench and bar of Mississippi that "[t]he mode of examination of a witness allowed by the trial court will not be criticized or reviewed unless gross injustice resulted therefrom." Mississippi Rule of Evidence 611(a) provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth.

M.R.E. 611(a). In *Parker v. State*, 401 So. 2d 1282, 1285 (Miss. 1981), the Mississippi Supreme Court held: "Ordinarily counsel may not complain of slight or not seriously prejudicial impropriety in remarks or comments by the court where they are provoked by himself."

We find that the question which provoked the trial judge's warning not to lead was indeed leading and that Rule 611(c) provides that leading questions should not be used on the direct examination of a witness. We synthesize our quotations from *Shows* and *Parker* with Mississippi Rule of Evidence 611 to find in the case *sub judice*, that when the trial court admonished Pittman's counsel not to lead Veronica Turnipseed on re-direct examination, he was "exercis[ing] reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth," an act of judicial discretion authorized by and therefore harmonious with Rule 611(a).

Even if we were to find that the trial judge acted beyond the "reasonable control over the mode and order of interrogating witnesses and presenting evidence" with which Rule 611(a) vests him, it remained incumbent upon Pittman's counsel to make an offer of proof to the trial court, "noting on the record for the benefit of the appellate court what evidence the trial judge['s ruling] excluded." *Heidel v. State*, 587 So. 2d 835, 839 (Miss. 1991). Pittman did not make such a proffer. We therefore cannot find that Carter, Pittman, or Willis were prejudiced by the improper exclusion of evidence.

Our determination that the trial court did not err when he admonished Pittman's counsel not to lead Veronica Turnipseed on re-direct examination obviates our further comment on his assertion that the trial judge's admonition conveyed the appearance to the jury that he was siding with the State in its prosecution of Carter, Pittman, and Willis. For the foregoing reasons, we resolve this issue adversely to the Appellants and hold that the trial judge did not err when he admonished Pittman's counsel not to lead Veronica Turnipseed on re-direct examination. If the trial judge did not err when he admonished Pittman's counsel not to lead that witness, then it follows that the trial judge did not err when he refused to admonish the jury to disregard his admonition and when he denied the three Appellants' motion for a mistrial.

**POINT FOUR: THE TRIAL COURT ERRED IN FAILING TO SUSTAIN APPELLANT'S MOTION FOR MISTRIAL AFTER THE STATE, IN DIRECT VIOLATION OF AN ORDER IN LIMINE, CROSS-EXAMINED APPELLANT ON HIS HAVING A GUN ON THE NIGHT IN QUESTION.**

To resolve this issue we must weigh two standards of review, one for motions *in limine* and one for the granting of a mistrial. In *Mask v. Elrod*, No. 92-CA-00950-SCT., slip op. 7-8 (Miss. Aug. 1, 1996), the Mississippi Supreme Court recited the following standard of review for the review of issues which involved motions *in limine*:

> The standard of review for a motion in limine issue is that the motion should be granted only when the trial court finds that: (1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury. *Gifford v. Four-County Electric Power Assoc.*, 615 So. 2d 1166, 1171 (Miss. 1992) (citing *Whittley v. City of Meridian*, 530 So. 2d 1341 (Miss. 1988)).

> On appeal, however, this Court must decide whether or not the [trial judge] abused his discretion in admitting or refusing to admit evidence at trial, given that the admissibility of evidence is generally within the trial judge's discretion. *Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991). The factors set out in *Whittley* are factors to be considered by the trial judge in making his ruling regarding the motion in limine and should not be confused with the standard of review with this Court applies to said ruling on appeal. This Court reaffirmed in *Whittley* that "broad discretion is vested in the trial court to guard against unfair innuendos which might arise as a result of trial strategy." *Whittley*, 530 So. 2d at 1345. Accordingly, this Court should examine the factors set out in *Whittley* to determine the correctness of the trial judge's ruling, but said examination should not be on a de novo basis, so long as there is no indication that the trial judge applied an incorrect legal standard.

In *Jackson v. State*, 672 So. 2d 468, 480 (Miss. 1996), the Mississippi Supreme court enunciated the following standard by which to review whether a trial court erred when it denied a motion for a mistrial:

> We note that the majority of federal appellate courts have stated the test thus: failure of a judge to order a mistrial or to exclude testimony will not justify reversal on appeal absent a showing of prejudice sufficient to constitute abuse of discretion. Such a test is consistent with our unflagging support of the trial court's power to control the progress of a trial. (citations omitted).

Before we resolve this issue in the light of the foregoing standards of review, we review the following events which transpired during the trial of the case *sub judice*. The bullet that killed Marcus J. Fulton came from a medium caliber handgun, either a .357 magnum, a .38 or a .09 millimeter, according to the testimony of Dr. Emily Ward, the State's forensic pathologist. When Willis was arrested several hours after the shoot-out on Highway 90, the arresting officers found a .09 millimeter handgun in his possession. However, based on subsequent ballistic tests, the State admitted that this .09 millimeter pistol *was not* the weapon from which the fatal shot was fired. As a result, prior to the beginning of the State's case, Willis moved *in limine* for an order precluding the State from mentioning the .09 millimeter handgun found in Willis's possession on the ground that such evidence would have an undue prejudicial effect on the jury.

The State opposed this motion. The State acknowledged that the .09 millimeter handgun was not the fatal weapon argued, but it contended that Willis' possession of this pistol when the shootout occurred on Highway 90 would establish Willis' own malevolent intent when he joined Pittman and Carter in the Cadillac as they left the parking lot at Carver Village to follow Lett's pick-up. The State also argued that Willis' possession of this particular firearm would rebut his assertion that his reason for becoming involved with Pittman and Carter was only an attempt to resolve peaceably the animosities which existed between Long and Carter.

By way of the following pronouncement, the trial court granted the motion:

> [T]he motion will be granted to this extent. That the State will not be allowed to introduce evidence in regard to this particular gun unless they can connect it with the crime. As I understand what the State is saying is they don't intend to try to prove that this gun was a weapon in regard to the crime. *But if the State can prove that this gun was at the scene at the time of the crime, then I will let them introduce it.* They will have to meet that predicate first. (Emphasis added.)

During the State's subsequent cross-examination of Willis, the following exchange occurred:

Q. Okay. What about his exhibit that has these .09 millimeter cartridges [found in Pittman's Cadillac at the time of his arrest]?

A. Have I seen that, too?

Q. Did you see that in the car?

A. No, Sir. I didn't.

Q. You didn't have a pistol that night?

A. No, sir, I didn't.

Q. You didn't have a pistol there in Carver Village?

A. Later that night.

Q. Later that night you had a pistol

A. Later that night.

Q. When was that?

A. When was that?

Q. Yes, sir.

A. Before I was arrested.


At this point in the State's cross-examination, Willis, outside the presence of the jury, moved for a mistrial. The ground upon which he did so was that the State's line of questioning was violative of the trial court's earlier order. After hearing both sides on the issue, the trial court denied Willis' motion for mistrial.

There could be no reason to grant a mistrial unless the previously quoted cross-examination of Willis constituted a violation of the trial court's conditional grant of Willis' motion *in limine.* Thus, we first consider whether the State's cross-examination of Willis which we quoted violated the trial court's conditional grant of Willis' motion *in limine.* The trial judge in the case *sub judice* did not specifically determine on the record whether "(1) [Willis' possession of a .09 millimeter pistol would] be inadmissible at a trial under the rules of evidence; and whether (2) the mere offer, reference, or statements made during trial concerning the material [would] tend to prejudice the jury." *See Gifford*, 615 So. 2d at 1171. However, our task as an appellate court is to "decide whether or not the [trial judge] abused his discretion in admitting or refusing to admit evidence at trial, given that the admissibility of evidence is generally within the trial judge's discretion." *See Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991).

We reject Willis' argument that the previously quoted cross-examination of Willis by the State violated the trial judge's earlier conditional grant of Willis' motion *in limine*. The trial judge's ruling did not deny the State an opportunity to establish that the .09 millimeter pistol was in Willis' possession when the Highway 90 shootout happened. We find that the State's cross-examination of Willis was its attempt to establish that Willis had the handgun in the white Cadillac which Pittman was driving when Marcus J. Fulton was fatally wounded. Joseph Long, the passenger on the right side of Lett's pick-up, testified that he saw both Carter and Willis sitting in the backseat of Pittman's pick-up and firing pistols into the pick-up in which he was riding.

Willis volunteered that he had a .09 millimeter pistol when the officers arrested him. The State's question "You didn't have a pistol in Carver Village?" could have as easily pertained to when Pittman, Carter, and Willis decided to pursue the pick-up truck as to after the shoot-out had

finished. It was Willis who volunteered the information about his possession of the handgun later that night. Neither was there anything in the record to indicate that the jury was informed that the pistol found on Willis was a .09 millimeter handgun. Thus, the jury was not able to make a connection between the fact that the bullet that killed Fulton was a medium caliber bullet and the fact that Willis' handgun was also a medium caliber handgun.

We observe that Willis' counsel objected to none of the State's questions which it asked Willis during its cross-examination which we have quoted. The answers that Willis gave to those questions did not violate the trial court's ruling on his motion *in limine* because they did not place the .09 millimeter pistol in the Cadillac -- much less in Willis' hands -- when the shoot-out occurred. Therefore, we cannot put the trial court in error for allowing the previously quoted cross-examination of Willis to have occurred, first, because Willis' counsel did not object to any of the questions as they were asked and, second, because none of that cross-examination indicated that the pistol which Willis had when he was arrested was related to Fulton's cause of death. The previously quoted standard of review for motions *in limine* hardly comes into play because the cross-examination about which Willis complains in this issue never placed the .09 millimeter pistol at the scene of the shoot-out in which Fulton was mortally wounded. In other words, the trial judge admitted no evidence which violated his conditional ruling on Willis' motion *in limine*. Because we hold that the trial judge did not violate his ruling on Willis' motion *in limine*, we need not consider whether he erred when he denied Willis' motion for a mistrial which Willis based on the trial court's violation of its ruling on his motion *in limine*. We resolve this issue adversely to the Appellants.

**POINT [FIVE]: THE TRIAL COURT ERRED IN NOT SEQUESTERING THE JURY AFTER THE JURY RECEIVED THE CASE.**

At the conclusion of the trial on May 28, 1992, the trial court advised the jury as follows:

Ladies and gentlemen, I have fifteen minutes after 5:00. I will let you go out and decide in the jury deliberation room whether or not you want to go ahead and deliberate tonight or come back tomorrow morning and start your deliberations at 9:00 a. m. Or you can deliberate as long as you want to. We will stay here with you. But if you make a decision to leave, just let us know and you can come back tomorrow morning at 9:00 o'clock to continue you deliberations. You can make that decision in the jury room. At this time I will excuse you to go and deliberate, and the Court will stand in recess until the jury comes back.

The record reflects that in response to these instructions from the trial judge, the jury retired to the jury room at 5:15, and at 5:30 they returned to announce to the trial judge that they had decided to go home for the night and to resume their deliberation at nine o'clock the next morning. The record reflects that no counsel for any of the three Appellants objected to the trial judge's instructions nor the jury's decision to return the next morning to begin their deliberation. Of interest to this Court is the information in the record that once the jury returned the next morning to begin their deliberation at nine o'clock, they did not return their verdict of

"Guilty of murder" against all three Appellants until two o'clock that afternoon, a period of approximately five hours.

Pittman asserts that this action by the trial judge was erroneous in that the "court was under a duty . . . to sequester the jury until a verdict was reached." However, Pittman cites no authority to support his contention that the trial judge so erred. Pittman even acknowledges that "Rule 5.07 of the Uniform Criminal Rules of Circuit Court Practice gives a court discretion as to whether or not to sequester a jury during the entire trial . . . ."

None of the three Appellants objected to the trial judge's allowing the jurors to decide for themselves whether they would begin to deliberate that evening or return the next morning to begin their deliberations. We can but speculate; but perhaps Appellants' counsel thought better of requiring jurors who had attended two days of trial to begin their deliberations late that evening when surely they were weary and ready to go home. Indeed, only fifteen minutes after they retired to the jury room to consider whether they would begin their deliberations that evening, they returned to the courtroom to advise the trial judge that they had decided to return the next morning to begin their deliberations. They then spent almost five hours deliberating the next day before they returned their verdicts of "Guilty of murder" against all three of the Appellants.

In *Hemphill v. State*, 566 So. 2d 207, 209 (Miss. 1990), the Mississippi Supreme Court held that the appellant's failure to object to the trial judge's decision to accept its own and prosecution's instructions and to refuse most of defendant's instructions constituted waiver of issue on appeal. Moreover, a Mississippi appellate court is under no duty to consider issues for which no supporting precedent is cited. *Jones v. State*, 481 So. 2d 798, 804 (Miss. 1985). Rule 5.07 of the Uniform Criminal Rules of Circuit Court Practice gave a trial judge discretion as to when to sequester a jury during a criminal trial if the crime did not involve the death penalty.

Pittman's issue is procedurally barred because neither he nor the other two Appellants objected to the trial judge's allowing the jury to decide whether they would begin to deliberate that evening or the next morning. Even if this issue was not procedurally barred, Pittman cites no authority on which this Court might rest a decision favorable to Pittman on this issue; thus we are not obligated to resolve it. On the other hand, Rule 5.07 of the Uniform Criminal Rules of Circuit Court Practice gave the trial judge discretion as to when to sequester this jury since the crime for which Carter, Pittman, and Willis were tried did not involve the death penalty. We do not think that the trial judge's manner of proceeding involved an abuse of his discretion. Thus, we resolve this issue adversely to Pittman and affirm the trial judge's allowing the jury to decide when they would begin to deliberate their verdict without sequestering them in the meantime.


**POINT [SIX] (CARTER'S ISSUE II):**


        **Whether the trial court erred in failing to consider the alternatives available under Section 43-21-159 of the Mississippi Code of 1972, when sentencing**

**appellant Carter, a sixteen year old at the time of sentencing.**

When this case was tried in May, 1992, Section 43-21-159(3) of the Mississippi Code gave the circuit judge discretion to consider alternative forms of punishment for any child who was convicted of a crime in that court. Among those alternatives were: "commit[ting] such child to the county jail for any term not in excess of one year," of suspending the child's sentence and releasing the child on probation, or "commit[ting] such child to the custody of the Mississippi Department of Corrections or impos[ing] a fine as though the child was an adult, under such terms and conditions as [the circuit judge] may prescribe . . . ." After the jury returned their verdict that Carter was guilty of murder, the trial judge entered an order on June 12, 1992, by which it deferred sentencing Carter until after a pre-sentencing investigation had been completed.

More than five months later, on October 16, 1992, the trial judge conducted a hearing to determine the appropriate sentence for Carter. The record of that hearing reflects that the thrust of Carter's argument for a reduced sentence was an alleged plea bargain by which Pittman and Willis would have pleaded guilty to manslaughter; Carter would have pleaded guilty to murder; and all three of them would have been sentenced to at least twelve years in the custody of the Mississippi Department of Corrections. However, according to Carter's counsel, Pittman and Willis refused the proposal, and their rejection of that offer required Carter to go to trial even though Carter wanted to accept the terms of the plea bargain. Pursuant to this hearing, the trial court entered a sentencing order in which he found:

> Upon request of Defendant's attorney, the Court deferred sentence in this cause and ordered a pre-sentence investigation due to the age of the Defendant. A pre-sentence investigation was completed and delivered to all parties and the Court for review, a copy of which is attached hereto. The Court has made an extensive study and investigation as to the possible alternatives available to the Court for sentencing, including consideration of the alternatives of the Youth Court Act, Sections 43-21-159(3), of the Mississippi Code of 1972; the consideration of the tender but mischievous years of the defendant in imposing sentence; the special circumstances of family surroundings of the minor defendant; serious consideration of alternatives enumerated in the law, including the facilities for care of a minor provided by statute; the pre-sentence report; all of the testimony from the trial and the nature of the offense. The Court finds and concludes that the alternatives did not provide proper and sufficient punishment for this defendant, where the evidence points directly to him as being the "shooter."

Pursuant to those findings, the trial judge then sentenced Carter "to serve a term of LIFE IMPRISONMENT in the custody of the Mississippi Department of Corrections."

Eleven months later, on September 17, 1993, the trial court conducted yet another hearing on an amended motion to reconsider sentence. At this hearing, Carter's counsel emphasized

Carter's youth when he committed the crime and that he had been a model prisoner while he had been incarcerated in the Jackson County jail. Carter's counsel suggested that the trial judge consider transporting Carter to "some type of youth detention facility and allowing him to serve his sentence there and be released when they see fit." On October 8, 1993, the trial judge entered an order in which he denied Carter's motion and amended motions for reconsideration of sentencing.

In at least three cases, the Mississippi Supreme Court has reviewed the issue of whether the trial judge sufficiently complied with the requirements of what was then section 43-21-159(3) when he refused to impose a sentence as an alternative to the statutory sentence prescribed for adults who had been convicted of that felony. In *May v. State*, 398 So. 2d 1331, 1340 (Miss. 1981), the Mississippi Supreme Court reversed and remanded the appellant's conviction of armed robbery because it found:

> In our opinion, in addition to his consideration of the expert testimony, which became a part of the record on the sentencing phase, the trial judge should have placed in the record the sources and facts of his study and should have permitted appellant's counsel to introduce evidence of the presence or absence of facilities at Mississippi State Penitentiary for care of the appellant, and the availability of other institutions or facilities which could e utilized by appellant. Therefore, we remand the cause to the lower court for hearing further evidence of extenuation or mitigation and for sentencing not inconsistent with this opinion.

Later in that same opinion, the supreme court opined:

> In our opinion, in addition to his consideration of the expert testimony, which became a part of the record on the sentencing phase, the trial judge should have placed in the record the sources and facts of his study and should have permitted appellant's counsel to introduce evidence of the presence or absence of facilities at Mississippi State Penitentiary for care of the appellant, and the availability of other institutions or facilities which could be utilized by appellant. Therefore, we remand the cause to the lower court for hearing further evidence of extenuation or mitigation and for sentencing not inconsistent with this opinion.

*Id.*

In *Reed v. State*, 526 So. 2d 538, 541 (Miss. 1988), the Mississippi Supreme Court affirmed the trial court's sentence of a seventeen-year-old defendant to serve a life sentence for the conviction of murder. Reed had contended that the trial court had "failed to make the specific findings and set forth the basis for the ultimate sentence as imposed as required by the statute in

*May* [*v. State*, 398 So. 2d 1331]." *Reed*, 526 So. 2d at 541. The Mississippi Supreme Court "point[ed] out the lower court judge's extensive review of 24 letters submitted by acquaintances of the defendant. More specifically, the judge took into consideration the tender years of the accused in imposing the sentence." *Id*. The supreme court concluded:

> Along these lines, the judge admits that he is fully aware of the discretion afforded him by the Youth Court Act. Despite this discretion, it was fully within the judge's discretion to impose a life sentence.

*Id.*

Finally, in *Swinford v. State*, 653 So. 2d 912, 917-18 (Miss. 1995), the Mississippi Supreme Court held that the following on-the-record statements by the trial judge were sufficient compliance with the requirements of section 43-21-159(3) to support his sentencing a fourteen-year-old girl to life imprisonment after a jury had convicted her of murder:

> I'm aware of the fact and have had to deal with, unfortunately had to deal with a fair number of cases of persons 14 years, 15 years of age, who were tried or pled guilty to capital offenses and then had to consider those sentencing alternative[s], all the alternatives set out by statute and by case law certainly the *May v. State* case, and I'm aware of those cases and aware of the requirements.
>
> In this particular case, I'm satisfied that the defendant having been indicted and tried as an adult, found guilty of the crime of murder, based on the jury verdict, the Court must impose the mandatory sentence of life imprisonment as set out by statute, recognizing again the alternative considerations that can be made as set out in *May v. State* and other cases.

The supreme court admonished the trial judge for his minimal compliance with the statute, but nonetheless held that he "adequately addressed the reasons for not utilizing the alternatives afforded." *Id.* at 918.

From both the police report of the incident which claimed Marcus J. Fulton's life and the pre-sentence report, this Court can determine that Carter had been in Youth Court on earlier prior offenses, that he had a history of being sent to juvenile detention centers, of not attending school. Our review of the record of the two hearings on Carter's motions to reconsider the trial court's sentence of life imprisonment divulges that the trial judge did consider alternatives to that sentence, among which were the sentencing alternatives afforded by section 43-21-159(3). He concluded that the alternatives to a sentence of life imprisonment "did not provide proper and sufficient punishment for [Carter] where the evidence points directly to him as being the shooter in this particular case."

Enlightened by the Mississippi Supreme Court's opinions in the three cases which we have reviewed, we find that in the case *sub judice* the trial judge adequately reviewed section 43-21-

59(3)'s alternative forms of punishment for Carter and that his findings which he included in the original sentencing order were more than persuasive to affirm the life sentence which he imposed on Carter, even though Carter was but fifteen years old when the shoot-out on Highway 90 occurred. Thus, we affirm the trial court's sentence of Carter "to serve a term of LIFE IMPRISONMENT in the custody of the Mississippi Department of Corrections."

**POINT [SEVEN]: THE CUMULATION OF ERROR IN THIS CASE DEMANDS REVERSAL**

The Appellants argue that the cumulation of the various errors that they have asserted warrant a new trial since the Mississippi Supreme Court has recognized that several errors not individually sufficient to require a reversal or a new trial may warrant such reversal when taken together. However, the validity of this argument rests upon this Court's finding of errors. We have resolved all six of the earlier issues against all three Appellants, and we have affirmed the trial court's decisions which generated all six of these issues. Without any errors, there is nothing to "accumulate." Accordingly, this argument also must fail.

**III. CONCLUSION**

The trial court adequately instructed the jury on the elements of murder and manslaughter by giving the three Jury Instructions S-1, one for each of the three Appellants, Jury Instructions S-2, which was prefatory to the three Jury Instructions S-3, again one for each of the three Appellants, and the three Jury Instructions S-3. Rule 611(a) and (c) supported the trial court's admonition to Pittman's counsel not to lead the witness on re-direct; and thus that admonition was not error -- especially since Pittman made no proffer of additional evidence that further re-direct examination would have produced.

Willis's complaint that the trial court violated its conditional granting of his motion *in limine* when it refused to grant his motion for a mistrial after the State had cross-examined him about whether he had a pistol when he got into Pittman's white Cadillac ignores the fact that the State elicited no evidence that the pistol which Willis admitted he had when he was arrested several hours after the Highway 90 shootout was connected with Marcus J. Fulton's death.

In the absence of any objection from any of the three Appellants to the trial judge's allowing the jury to decide when they would begin their deliberation, which lasted almost five hours once they began their deliberations the next morning, and in the further absence of any authority to support the Appellants' position on this issue, we hold that Rule 5.07 of the Uniform Criminal Rules of Circuit Court Practice gave the trial judge discretion as to when to sequester this jury since the crime for which Carter, Pittman, and Willis were tried did not involve the death penalty.

Carter cannot complain of the trial court's failure to abide by the requirement of section 43-21-59(3) of the Mississippi Code because the record discloses that the trial judge did

consider the sentencing alternatives which that section of the code afforded him. The record also divulges that Carter's own delinquency sustained the trial court's imposition of a life sentence in the custody of the Mississippi Department of Corrections. If this Court can find no errors in the various issues which the Appellants either collectively or individually have asserted, then there can be no accumulation of errors sufficient to require that we reverse and remand for a new trial. For the foregoing reasons, we affirm the judgments and sentences of the Jackson County Circuit Court.

**THE JACKSON COUNTY CIRCUIT COURT JUDGMENTS OF ALL THREE APPELLANTS' GUILT OF MURDER AND ITS SENTENCES OF EACH OF THEM TO SERVE A LIFE TERM IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED. COSTS ARE ASSESSED TO JACKSON COUNTY.**

**FRAISER, C.J., BRIDGES AND THOMAS, P.JJ., BARBER, DIAZ, KING, McMILLIN, PAYNE, AND SOUTHWICK, JJ., CONCUR.**