# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 12, 2011

No. 09-70029

Lyle W. Cayce
Clerk

JESSE JOE HERNANDEZ,

Petitioner–Appellant,

v.

RICK THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent–Appellee.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:06-CV-846

Before GARZA, CLEMENT, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:[*]

Jesse Joe Hernandez (Hernandez) requests a certificate of appealability (COA) on his claim that the prosecution violated the Fifth Amendment during his state court trial by remarking on his failure to testify on his own behalf. For the following reasons, we deny the COA.

**I**

In July 2002, a Texas jury found Hernandez guilty of capital murder after it determined that Hernandez murdered ten-month-old Karlos Borja on or about

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-70029

April 11, 2001.  The facts surrounding Karlos's death, as recited by the Texas Court of Criminal Appeals, are as follows:

> The evidence at trial showed that at the time Karlos and Melodi were assaulted, Misty Leverett, [ten-month-old] Karlos, and [four-year-old] Melodi, were living with appellant [Hernandez], his wife Mary Rojas, their young son, Joshua, and Gilbert Gomez.  On the day of the assaults, Leverett went to work and left the children in the care of appellant and Rojas.  Rojas testified that after Leverett left for work around noon, she stayed home with the children while appellant and Gomez left to run errands.  When appellant and Gomez returned about two hours later, Rojas left for her sister-in-law's house and was gone approximately thirty to forty-five minutes.  Rojas testified that when she got home, she heard appellant screaming at Joshua.  She picked him up and took him to the room she shared with appellant.  Rojas asked where Karlos and Melodi were, and appellant replied that they were sleeping in the next room.  Rojas then went into her room and relaxed with Joshua.  Later, when she heard appellant preparing a bottle, she told appellant she was going to go into the room where Karlos and Melodi were sleeping.  Appellant instructed Rojas not to enter the room for fear she would wake them up.  Despite having seen blood stains on appellant's shirt, Rojas waited until Leverett got home from work to check on the children.
>
> Leverett testified that when she arrived home, she went into the dark room she shared with her children and found Melodi complaining that her head hurt.  Rojas and Leverett took Melodi out into the kitchen and saw that her head was swollen with "red splotches."  Alarmed, Leverett decided to take Melodi to the hospital.  After they left, Rojas checked on Karlos and noticed his lips were swollen.  She determined Karlos was badly hurt and took Karlos and Joshua down the street to her sister-in-law's house to call an ambulance.
>
> When Leverett and Melodi arrived at the hospital, hospital workers asked Leverett if she had any other children.  When she replied that she did, the hospital workers instructed her to return home and get her son immediately.  Leverett testified that when she returned home, appellant was alone and he told her that Karlos was at his sister's house.  Leverett asked appellant to take her there but he refused.  Moments later, police arrived and informed Leverett that Karlos had been rushed to Children's Hospital by ambulance.

2

No. 09-70029

In addition to this evidence, appellant stated in his voluntary written statement that he was babysitting Melodi and Karlos and "they were being very bad by crying a lot for nothing." Appellant continued that he "just exploded and hit them with the back of my hand not realizing I was hurting them[.]"[1]

Karlos died approximately one week after the beating.[2]

During the guilt phase of Hernandez's trial, the prosecution introduced evidence that Hernandez's right hand appeared swollen during the hours following the time when Karlos and Melodi were beaten. Mary Rojas, Hernandez's wife, testified that she noticed the swelling in his right hand and told a police officer about it. The jury also heard testimony from two different detectives who also noticed swelling in Hernandez's hand. Detective Lesher, one of the officers who interviewed Hernandez, testified that the back of one of Hernandez's hands "was swollen more than the other hand was." Detective Breedlove, who interviewed Hernandez on two occasions—once the morning of the incident and then later that afternoon—testified that, although he did not notice any swelling in Hernandez's hand during the morning interview, he did notice the swelling that afternoon. Hernandez was jailed between these interviews, and Hernandez's attorney asked Detective Breedlove on cross-examination whether Detective Breedlove recalled being told by one of the jailers that, in between the interviews, Hernandez was "beating on the cell in there or causing a ruckus." Detective Breedlove did not recall any such statement.

During closing arguments, the parties offered competing theories on the origin of Hernandez's swollen hand. The defense, during its closing statement, made the following comments:

---

[1] *See Hernandez v. State*, No. 74401, 2004 WL 3093221, at *3-4 (Tex. Crim. App. May 26, 2004) (footnote omitted).

[2] *Id.* at *1 n.2.

3

No. 09-70029

Then the swollen hand, the magic swollen hand. There's another beauty. The swollen hand. Really. What do you remember from cross-examination on this? They're investigating someone that's allegedly abused a child. Hasn't been a death yet, but guess what? Nothing in the police reports, any of them.

I asked Hernandez, Chacon, Lesher, Breedlove. Anything in there about Mary saying something at the house about look at his hands or the shirt involved or the exchanges that Mary allegedly had with Jesse? No. Asked the police officer. You remember that? No. Look in the police report. Nothing.

You know Breedlove huddled with the officers right before he brought Jesse Hernandez at 5:00 o'clock and that's crucial, important stuff. You know that Breedlove interrogated him for two hours where he was sitting distance from here to here. Never noticed a swollen hand ever. Nothing. For two hours. Even watched him write the affidavit. Said it took him an hour.

I asked, "When you got him out of jail, do you remember a jailer saying he hit his hands on the wall pounding the cell?" "No, I don't remember that."

All of a sudden, everybody sees a swollen hand. Oh, there it is. Must have been from what happened out there. Really. You might think this is kind of Oliver Stone or conspiracy theories. Take a good look at Mary's statement, the one she gave here. Look at her handwriting. Look through all of them, it's the same. Same handwriting. Nothing changes. All of a sudden at the very end look at the different spelling that says "that was when I noticed his hand was swollen."

Thereafter, the prosecution, in its rebuttal argument, also addressed the swollen hand:

Look, we haven't come in here and made promises that we can't back up. We presented evidence to you that shows him guilty. We haven't come in with innuendo. You know, where is this proof about him striking something over in the jail causing him to swell his hand? Where is that proof there? You haven't heard it from any witness. We're not the ones coming in here making these promises that we can't back up.

No. 09-70029

The jury ultimately found Hernandez guilty and recommended a death sentence, which the trial court imposed.

Hernandez filed a direct appeal to the Texas Court of Criminal Appeals in which he raised a number of claims, including the claim that the prosecution impermissibly commented on his failure to testify when it made the above-excerpted statement addressing the swollen hand. The Texas Court of Criminal Appeals concluded Hernandez had forfeited this claim by failing to object to the prosecutor's statement at trial.[3] The court also rejected Hernandez's other claims and affirmed his conviction and sentence.[4]

Subsequently, Hernandez filed an application for a writ of habeas corpus in state court. That application included a claim that Hernandez's trial counsel was ineffective for failing to object to the comment that Hernandez characterized as a commentary on his failure to testify. The state court determined that Hernandez's trial counsel did not act unreasonably in failing to object and that, even if the failure to object was unreasonable, it was not prejudicial to Hernandez. Additionally, the state court concluded that Hernandez's underlying claim lacked merit. In the state court's opinion, the contested comment referred not to Hernandez's failure to testify but to Hernandez's "failure to call a witness who would support his theory that he injured his hand pounding on his cell"—specifically, the unnamed jailer that Hernandez implied could have testified that Hernandez spent all day pounding his hands on his jail cell. Hernandez appealed to the Texas Court of Criminal Appeals, which adopted the findings and conclusions of the trial court.[5]

---

[3] *Id.* at *7.

[4] *Id.* at *8.

[5] *Ex parte Hernandez*, No. WR-62840-01, 2006 WL 1174307, at *1 (Tex. Crim. App. May 3, 2006).

5

No. 09-70029

Hernandez then filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Texas. Hernandez's petition raised seven claims, one of which was that the prosecution violated Hernandez's Fifth Amendment right against self-incrimination by allegedly commenting on Hernandez's failure to testify to explain the swelling in his hand. The district court determined that Hernandez's Fifth Amendment claim was procedurally defaulted, due to Hernandez's failure to object to the prosecution's statement at trial, and that Hernandez had not attempted to establish any of the various exceptions to the procedural default rule. Accordingly, the district court dismissed this claim on procedural grounds. The court rejected the rest of Hernandez's claims on the merits. Hernandez subsequently requested a COA with respect to his Fifth Amendment claim, which the district court denied. Hernandez now requests a COA from this court.

## II

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition."[6] Instead, the prisoner must first obtain a COA from a circuit justice or judge.[7] "[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."[8]

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[9] An applicant makes such a "substantial showing of the denial of a constitutional right" when he demonstrates "that reasonable jurists could debate whether (or, for that matter,

---

[6] *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003) (citing 28 U.S.C. § 2253).

[7] *Id.* at 335-36.

[8] *Id.* at 336.

[9] 28 U.S.C. § 2253(c)(2).

No. 09-70029

agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."[10] The "issuance of 'a COA does not require a showing that the appeal will succeed,'" however, and we should not decline an applicant's request for a COA merely because we believe that the applicant will ultimately fail to establish his entitlement to habeas relief.[11] When, as here, an applicant faces a death sentence, we will resolve any doubts as to whether a COA should issue in his favor.[12]

## III

The district court dismissed Hernandez's Fifth Amendment claim on procedural grounds. Thus, in order to show his entitlement to a COA, Hernandez must demonstrate two things: (1) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling" and (2) "that jurists of reason would find it debatable whether" he states a valid Fifth Amendment claim.[13] Hernandez has failed to make the necessary demonstration with respect to both inquiries.

## A

We begin with the district court's procedural ruling—that Hernandez's Fifth Amendment claim was procedurally defaulted because of his failure to object to the prosecutor's statements during trial. Hernandez does not dispute that he did not raise his Fifth Amendment objection during his trial in state court. Rather, he claims we can use the plain error standard of review to

---

[10] *Miller-El*, 537 U.S. at 336 (internal quotation marks omitted).

[11] *Williams v. Thaler*, 602 F.3d 291, 301 (5th Cir. 2010) (quoting *Miller-El*, 537 U.S. at 337).

[12] *Id.* (citing *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005)).

[13] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

recognize the prosecution's allegedly unconstitutional actions.  The plain error standard of review allows us to remedy unpreserved clear errors that affect a defendant's substantial rights and the fairness, integrity, or public reputation of judicial proceedings.[14]  Hernandez argues that the error was clear and obvious—"the comment by the prosecutor could only have been interpreted by the jury as a reference to Hernandez's failure to testify"—and affected a substantial right—"his Fifth Amendment privilege against self-incrimination." He argues that "the error seriously affected the fairness of the proceedings and went to the heart of the integrity of the judicial system."

We reject Hernandez's argument for the simple reason that the plain error standard of review is an instrument of direct review.  It does not apply in the context of a collateral attack on the constitutional validity of a final conviction.[15] Because Hernandez failed to preserve his Fifth Amendment objection in his state court proceedings and we are not engaged in a direct review of those proceedings, Hernandez's claim implicates the rule of procedural default.

Under the procedural default rule, federal habeas relief is generally not available "when a state court declined to address a prisoner's federal claims because the prisoner . . . failed to meet a state procedural requirement."[16]  This is so because in such cases "the state judgment rests on independent and

---

[14] *See United States v. Juarez*, 626 F.3d 246, 254 (5th Cir. 2010).

[15] *Engle v. Isaac*, 456 U.S. 107, 134-35 (1982) ("The federal courts apply a plain-error rule for direct review of federal convictions.  Federal habeas challenges to state convictions, however, entail greater finality problems and special comity concerns.  We remain convinced that the burden of justifying federal habeas relief for state prisoners is greater than the showing required to establish plain error on direct appeal." (internal quotation marks omitted)); s*ee also Scott v. Mitchell*, 209 F.3d 854, 872 n.6 (6th Cir. 2000) (rejecting the argument that a procedurally defaulted claim should be reviewed for plain error on habeas review).

[16] *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

adequate state procedural grounds."[17]    Here, the Texas Court of Criminal Appeals refused to consider Hernandez's Fifth Amendment claim because Hernandez failed to comply with Texas's contemporaneous objection rule—he failed to object to the purportedly unconstitutional statements when the prosecution made them.  Texas's contemporaneous objection rule is an adequate and independent state procedural ground.[18] Hernandez's failure to comply with it means he has defaulted his Fifth Amendment claim.

However, exceptions to the procedural default rule exist.  There are two.  First, the prisoner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."[19]  Second, the prisoner can "demonstrate that failure to consider the [federal] claim[] will result in a fundamental miscarriage of justice."[20]  These exceptions present significantly higher hurdles for a prisoner to successfully navigate than the plain error standard that we apply to unpreserved issues on direct appeal.[21]

Here, Hernandez does not argue that these exceptions warrant waiver of his procedural default.  He does not contend that cause and prejudice exist: although he argued in his state habeas petition that his trial attorney's failure to object to the prosecutor's statements constituted ineffective assistance of counsel, a form of cause,[22] he failed to repeat that argument to the district court below and he does not repeat it here.  Nor does he contend that application of the

---

[17] *Id.* at 730.

[18] *See Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (holding that the Texas contemporaneous objection rule is "an adequate procedural bar" (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir. 2000))).

[19] *Coleman*, 501 U.S. at 750.

[20] *Id.*

[21] *See United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (en banc).

[22] *Coleman*, 501 U.S. at 753-54.

procedural bar will result in a fundamental miscarriage of justice. He does not attempt to show, "as a factual matter, that he did not commit the crime of conviction."[23]   Because Hernandez fails to present an argument for the application of either of the exceptions to the procedural default rule, no jurist could reasonably argue that the district court erred in finding Hernandez's claim procedurally defaulted. Accordingly, Hernandez is not entitled to a COA on his Fifth Amendment claim.

**B**

We also deny Hernandez a COA on his claim for the alternative reason that, even if Hernandez could demonstrate that jurists of reason would find debatable the correctness of the district court's procedural ruling, he still has not shown that reasonable jurists would find it debatable whether he has alleged a valid Fifth Amendment claim.

The Fifth Amendment not only affords a criminal defendant the right not to testify at his trial, but also bars prosecutors from commenting on a criminal defendant's exercise of that right.[24] We ask two questions to determine whether a prosecutor's remarks were constitutionally impermissible. An affirmative answer to either means that they were. First, we ask "whether the prosecutor's manifest intent was to comment on the defendant's silence."[25] "The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark."[26] Alternatively, we ask "whether the character of the remark was

---

[23] *Cantu v. Thaler*, 632 F.3d 157, 166-67 (5th Cir. 2011) (quoting *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999)).

[24] *See Griffin v. California*, 380 U.S. 609, 614-15 (1965); *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996) ("It is, of course, improper for a prosecutor to comment on a defendant's exercise of his Fifth Amendment rights.").

[25] *Grosz*, 76 F.3d at 1326 (quoting *United States v. Collins*, 972 F.2d 1385, 1406 (5th Cir. 1992)).

[26]  *Id.* (citing *Collins*, 972 F.2d at 1406).

such that the jury would naturally and necessarily construe it as a comment on the defendant's silence."[27]   With respect to this second inquiry, "the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so."[28] In answering these questions, we consider a prosecutor's remarks "in the context of the case in which they are made."[29]

During closing arguments, Hernandez's attorney asserted the following to the jury:

> You know Breedlove huddled with the officers right before he brought Jesse Hernandez at 5:00 o'clock and that's crucial, important stuff.  You know that Breedlove interrogated him for two hours where he was sitting distance from here to here.  Never noticed a swollen hand ever.  Nothing.  For two hours.  Even watched him write the affidavit.  Said it took him an hour.
>
> I asked, "When you got him out of jail, do you remember a jailer saying he hit his hands on the wall pounding the cell?"  "No, I don't remember that."

Subsequently, on rebuttal, the prosecution remarked:

> Look, we haven't come in here and made promises that we can't back up.  We presented evidence to you that shows him guilty.  We haven't come in with innuendo.  You know, where is this proof about him striking something over in the jail causing him to swell his hand?  Where is that proof there?  You haven't heard it from any

---

[27]  *Id.* (quoting *Collins*, 972 F.2d at 1406); *see also Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) ("For there to have been a denial of one's [F]ifth [A]mendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.").

[28]  *Grosz*, 76 F.3d at 1326 (quoting *Collins*, 972 F.2d at 1406) (internal quotation marks omitted).

[29]  *United States v. Johnston*, 127 F.3d 380, 396 (5th Cir. 1997) (citing *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1179 (5th Cir. 1993)).

No. 09-70029

witness. We're not the ones coming in here making these promises that we can't back up.

Hernandez argues that the prosecutor's remarks violated the Fifth Amendment because the prosecutor's statement that "[y]ou haven't heard it from any witness" necessarily referred to Hernandez's failure to testify. He summarizes his claim as follows:

> The evidence adduced at trial conclusively demonstrated that only three persons could possibly have knowledge of and testify regarding Petitioner's bruised and swollen hand, which according to the State's theory had been caused by Petitioner striking the deceased victim. Two of those three witnesses were peace officers who were in fact called by the State to testify about the injuries. The *only* remaining witness who could offer any explanation as to how the injury occurred was Petitioner himself, who had invoked his constitutional right to remain silent.

It is true that a Fifth Amendment violation occurs when a prosecutor refers to a lack of evidence in support of a defendant's theory when the comment necessarily refers to the defendant's failure to testify. In *United States v. Johnston*, for example, we held that a Fifth Amendment violation occurred when a prosecutor, in response to a witness's testimony that no other person could corroborate his testimony about a number of activities, inquired on redirect "[A]ren't there some people in this courtroom that can back up what you say?"[30] The prosecutor also simultaneously "made a sweeping arm gesture indicating the individuals seated at counsel tables."[31] As we explained, a violation occurred because:

> In responding to the cross-examination to the effect that there were no witnesses who could corroborate [the witness's] testimony, the prosecutor implied that there were such people in the courtroom, obviously referring to the defendants. No one else in the court room

---

[30] *Id.* at 397.

[31] *Id.*

12

No. 09-70029

could have witnessed the events; only the defendants could reasonably be thought to be capable of providing corroboration.[32]

In this case, however, one could plausibly interpret the prosecutor's remarks as referring to the lack of corroboration for Hernandez's story in the testimony of other actual and potential witnesses.  The prosecutor could have been commenting on the lack of corroboration for Hernandez's theory in the testimony of Detectives Breedlove and Lesher, for example.  Or the prosecutor could have been remarking on the failure of the defense to present the testimony of the jailer who allegedly saw Hernandez pounding his hands on the jail cell. Indeed, when considered in context, it is not debatable in this case "(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence."[33]  We thus deny Hernandez a COA on his Fifth Amendment claim for the separate reason that jurists of reason would not find it debatable whether he has alleged a valid Fifth Amendment claim.  He has not.

\* \* \*

For the above reasons, we DENY Hernandez's motion for a COA.

---

[32] *Id.*

[33] *Grosz*, 76 F.3d at 1326 (quoting *Collins*, 972 F.2d at 1406).

13